GARCIA & ANTOSH, LLP
1401 Central
Dodge City, Kansas 67801
(620) 225-7400  P
(620) 225-4339  F

# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF KANSAS

| | |
|---|---|
| **UNITED STATES** *ex rel.* **WILLIAM ROWE,** | *Plaintiff-Relator,* |
| v. | **Case No.:** 6:18-cv-01113-JTM-GEB |
| **DODGE CITY COMMUNITY COLLEGE,** **ANTHONY LYONS,** **DANNY GILLUM** *and* **RENEE GILLUM,** *Husband and Wife,* **UHI, Inc.,** **GORDON JIROUX** *and* **DONNA JIROUX,** *Husband and Wife,* | *Defendants.* |

## COMPLAINT

**Filed In Camera and Under Seal Pursuant to 31 U.S.C. § 3730(b)(2)**
**Trial to a Jury Requested**
**Designation of Place of Trial: Wichita, Kansas**

Relator William Rowe, for his Complaint alleges as follows:

### INTRODUCTION

1. This is an action by *qui tam* Relator, William Rowe (hereinafter "Relator" or "Rowe"), on behalf of himself and the United States Government, to recover damages and penalties resulting from violations of the False Claims Act (the "FCA") by Defendants Dodge City Community College ("DCCC"), Anthony Lyons ("Lyons") and Danny Gillum ("Gillum") (collectively "DCCC Defendants") on one hand and by UHI, Inc. ("UHI"), and its

president and chief executive officer Gordon Jiroux ("Jiroux") (collectively "UHI Defendants").

2. Relator's claims for violations of the FCA center around the Defendants' individual and concerted actions to defraud the government in connection with Defendants' administration of a helicopter flight training program within DCCC's Associate of Applied Science Flight Instructor Pilot Degree Program ("Helicopter Program").

## JURISDICTION - VENUE - JURY DEMAND

3. This action arises under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

4. This Court has subject matter jurisdiction pursuant to 31 U.S.C. § 3732(a); 28 U.S.C. §§ 1345 and 1367(a) and over the state claims pursuant to 31 U.S.C. § 3730.

5. This Court has personal jurisdiction over the Defendants.

6. Venue is proper in this district under 28 U.S.C. §§ 1391(b), and 1391(c), and under 31 U.S.C. § 3732(a). The DCCC Defendants may be found and reside in the district, the UHI Defendants transact business within the district, and the acts proscribed by the FCA occurred within the district.

7. There has been no public disclosure of the FCA violations or of the fraudulent transactions alleged herein before Relator's filing of this Complaint.

8. Relator is entitled to and demands trial by Jury.

## PARTIES

9. Relator was at all relevant times a resident of Kansas and a United States Citizen. He is

a veteran of the United States Marine Corps, having served from February 2002 through February 2006 when he was honorably discharged after service both state-side as well as in the Middle-East.

10. Relator was a student in DCCC's Helicopter Program from May 2015 to January 2017.

11. Defendant Dodge City Community College is a political subdivision of the State of Kansas operating within Ford County, Kansas.

12. Defendant Anthony Lyons is a resident of Kansas who, on information and belief, resides in Sedgwick County, Kansas. Lyons was, at all relevant times, Vice President of Aerospace Programs / Community and Industry Relations at DCCC.

13. Defendant Danny Gillum is a resident of Kansas who, on information and belief, resides in Ford County, Kansas. On information and belief Gillum is married to and resides with Renee Gillum. At all times relevant, Gillum was acting in the furtherance of their marital community. Gillum was, at all relevant times, Executive Vice President for Academic Affairs / Chief Academic Officer at DCCC.

14. UHI is an Arizona for-profit entity that, at all times relevant to this Complaint, was conducting business in the States of Kansas and Arizona. UHI is managed by Defendant Jiroux. Accordingly, Jiroux directed and controlled the actions of UHI that are alleged herein. As an owner of UHI he personally benefitted from any gain to UHI.

15. UHI furnishes education to adults.

16. Defendant Gordon Jiroux is a resident of Arizona who, on information and belief, resides in Maricopa County, Arizona. On information and belief Jiroux is married to and resides

with Defendant Donna Jiroux.  At all times relevant, Jiroux was acting in the furtherance of their marital community.

17. Each Defendant is a person under the FCA who caused events to occur or concealed facts from the government within the district which give rise to this Complaint.

## GOVERNING LAWS AND REGULATIONS

### THE FALSE CLAIMS ACT - 31 U.S.C. §§3729-3733 ("FCA")

18. The FCA was originally passed during the civil war to deter and remedy fraud against the government by military contractors.  It has been amended and expanded, most notably since 1986, to extend its reach and use.

19. Sections 3729(a)(1)(A) and (B) set forth FCA liability for any person who knowingly submits a false claim to the government or causes another to submit a false claim to the government or knowingly makes a false record or statement to get a false claim paid by the government.  Section 3729(a)(1)(G) is known as the reverse false claims section; it provides liability where one acts improperly–not to get money from the government, but to avoid having to pay money to the government.  Section 3729(a)(1)(C) creates liability for those who conspire to violate the FCA.

20. Damages.  A person found in violation of the FCA is liable to the government for treble damages and for a penalty of between $5,500.00 and $11,000.00 per violation.

21. Qui Tam Provision and Relator's Award.  Under the FCA, private individuals known as Relators can bring action on behalf of the United States (known as a qui tam action) to

recover monies that defendants obtained or retained in violation of the FCA. Private Relators are entitled to a bounty of between 15 and 30% of amounts recovered in an action for violation of the FCA as well as legal fees and expenses of the action.

22. Scienter: In order to prove a violation of the FCA, a Relator need only show that a person acted in reckless disregard for whether or not claims submitted or statements made were false or whether monies retained were owed back to the federal government. The FCA defines "knowingly" as (1) actual knowledge, (2) deliberate ignorance of the truth or falsity of the information, or (3) reckless disregard of the truth or falsity of the information. Accordingly a Relator can prove a violation of the FCA by showing that a person acted in reckless disregard for whether or not claims submitted or statements made were false or whether the person avoided with reckless disregard an obligation to pay monies to the federal government. Scienter can be established where there is an absence of effort to make simple inquiries as to the proper billing methods.

## VA REGULATIONS; THE 85/15 RULE; AND THE GI BILL

23. The United States Department of Veterans Affairs ("VA") is the federal government's second largest department and is responsible for administering programs of veterans' benefits for veterans, their families, and survivors.

24. VA administers benefits programs for veterans including the Montgomery GI Bill and the Post 9/11 GI Bill which provide educational benefits to eligible veterans.

25. These GI Bill benefits include financial support for vets to pursue a helicopter pilot flight

training/degree program.

26. The dollar value of VA benefit for flight training varies by the type of program. The relevant program in this case is for veterans enrolled in a degree program that consists of flight training at a public Institution of Higher Learning. For such programs, eligible veterans can be reimbursed up to the resident instate cost of the training (and will be eligible to receive housing allowance and a books and supplies stipend.)

27. When a private educational institution contracts with a public educational institution, VA does not limit the benefit amount it provides qualifying veterans each term.

28. Except under certain narrow circumstances (not at issue in this case), VA regulations require that no more than 85% of the students in the program can be funded by VA or by the educational institution ("supported enrollment"). This is referred to as the 85/15 Percent Ratio Rule ("85/15 Rule"). 38 CFR § 21.4201(a); 38 U.S.C. § 3680A(d).

29. The 85/15 Rule "was created to protect the GI Bill from academic programs that rely too heavily on veterans' education benefits to stay in business." (ref. 10/31/15 Carper Ernst Senate letter)

30. Veterans who are eligible for VA support cannot be counted as non-supported. 38 CFR § 21.4201(e)(2)(i).

31. To determine if the 85/15 Rule is satisfied, participating educational institutions, including DCCC and UHI, must calculate and report to VA their actual ratios of non-supported enrollment to all enrollment. 38 CFR § 21.4201(e)(3).

32. Participating educational institutions such as DCCC and UHI must provide such

"Compliance Calculations" to VA within 30 days of the beginning of each Spring and Fall semester/term. 38 CFR § 21.4201(f)(2)(i).

33. VA only processes new enrollments of eligible veterans when Compliance Calculations show the 85/15 Rule is satisfied. No new VA benefits are to be paid when Compliance Calculations establish the 85/15 ratio is not satisfied. 38 CFR § 21.4201(g)(1)(i).

34. VA may suspend payments or disapprove further enrollments or re-enrollments of individuals seeking VA assistance when the educational institution has violated VA's recordkeeping or reporting requirements resulting in a substantial pattern of eligible veterans receiving benefits to which they are not entitled. 38 CFR § 21.4210(d)(2)(ii)(A) and (C).

35. As a sub-contracted portion providing a flight course, UHI must separately meet all the requirements of the 85/15 Rule. 38 CFR § 21.4263(l).

36. VA may suspend payments or disapprove further enrollments or re-enrollments of individuals seeking VA assistance when the educational institution has violated one or more of the provisions of 38 CFR § 21.4263. 38 CFR § 21.4210(d)(2)(i).

37. Compliance with the 85/15 Rule must be satisfied at each branch or extension of DCCC. 38 CFR § 4201(e)(1).

38. When any DCCC course or curriculum varies in any way from a similar course, although it may have the same designation as the other similar course or curriculum, each course will require a separate 85/15 computation. A course or curriculum will be considered to vary from another if there are different attendance requirements, required unit subjects

are different, or if required completion length is different.  38 CFR § 4201(e)(1).

39. For DCCC's Associate of Applied Science "AAS" degree courses where a field is specified, 85/15 compliance must be computed separately for each objective.  38 CFR § 4201(e)(1)(i)(A).

40. When a school offers all or part of a flight course under a contract with another school (as DCCC has done with UHI), all charges for instruction are made by, and paid to, one entity having jurisdiction and control over both the flight and ground portions of the program.  38 CFR § 21.4263(h).

41. VA may waive collection of overpayment from a veteran enrolled at DCCC, but so doing does not relieve DCCC of liability for any overpayment.  38 CFR § 21.4009(f).

## FACTUAL ALLEGATIONS

42. In 2008 DCCC and UHI entered into an agreement and contract whereby UHI would provide helicopter pilot training to DCCC students.

43. Prior to 2009, the GI Bill was very restrictive with respect to payment of education benefits to vocational schools (including flight training schools such as UHI.)

44. In 2009 the GI Bill was amended to remove spending caps on payments for veterans pursuing degrees at public colleges and universities.

45. This allowed for an arrangement whereby schools such as DCCC could add the window-dressing of an associates' degree program on top of vocational training such as UHI's helicopter pilot training and bill the VA unlimited amounts.

46. These sorts of arrangements incentivized a boom in helicopter flight training programs aligned with (primarily) community colleges.

47. The benefit to the community colleges (like DCCC) was that they could charge tuition on high-dollar degree programs, often at minimal cost (since much of the training they provided was on-line "distance learning" while students were based out-of-state.)

48. The benefits to the vocational training providers they contracted with (such as UHI) were numerous, including but not limited to:

    a. The veneer of the degree programs they were associated with opened the spigot of unlimited VA funding for their vocational training.

    b. The schools they were associated with provided them with free recruiting.

49. But with exponentially-increased funding came problems, namely:

    a. Costly competition for students, with increased equipment costs and post-employment guarantees.

    b. Market effects due to the increase in available pilot graduates relative to the number of available pilot jobs.

50. With regard to increased equipment costs: more money flowing into training programs meant an "arms race" wherein vocational training providers such as UHI bought more, newer, bigger and more expensive helicopters so that they could entice prospective students with having "state of the art" equipment. Effectively it was like a driver's education program offering training on Corvettes rather than Honda Civics. This, notwithstanding the fact that employers as a general rule were far, far more likely to hire

new pilots to fly their "Honda Civic" helicopters rather than their "Corvette" helicopters for a number of reasons both economic and practical.

51. With regard to post-employment guarantees: as a general rule, helicopter training program graduates are commercially unemployable until they have a certain number of flight hours under their belts. The industry response to this has been to employ new graduates as flight instructors (for the schools they graduated from.) They then gain their hours, at relatively low wages, by training other pilots. This is a big selling point for flight training programs. On its webpage, DCCC advertises that "[a]fter more than eight (8) years of operations, DC3/UHI have no unemployed graduates and 100% placement in the commercial pilot industry." dc3.edu/degree-program/flight-instructor, accessed April 5, 2018. The need to provide students for these trainers added further pressure on UHI to keep bringing students in.

### Regarding 85/15 Rule Compliance

52. The trouble for DCCC and UHI was the 85/15 Rule. As the program bloated given the 2009+ VA money windfall, it became impossible to recruit "non-supported" students willing to pay out-of-pocket in line with what DCCC and UHI could get away with billing the VA for its supported students.

53. In response, DCCC and UHI shirked the rule.

54. In Relator's first semester of training with DCCC and UHI, which took place from approximately **May 2015 - August 2015**, the composition and support status of the

DCCC/UHI flight program was as follows:

| Module/Objective | Student | Support Status |
|---|---|---|
| PVT | Relator | VA |
| PVT | Shelby | VA |
| PVT | Colton | VA |
| PVT | Adam | VA |
| IFR | Michael | VA |
| IFR | Jesse F. | VA |
| COM | Chaylen | None - but "Part 61" training |
| COM | Nolan | VA |

55. In Relator's second semester of training with DCCC and UHI, which took place from approximately **August 2015 - December 2015**, the composition and support status of the DCCC/UHI flight program was as follows:

| Module/Objective | Student | Support Status |
|---|---|---|
| IFR | Relator | VA |
| IFR | Shelby | VA |
| IFR | Colton | VA |
| IFR | Jesse F. | VA |
| COM | Michael | VA |
| CFI | Chaylen | None - but "Part 61" training |
| CFI | Nolan | VA |
| PVT | Eric | VA |
| PVT | Lucas | VA |
| PVT | Tyler | VA |

11

| | | |
|---|---|---|
| PVT | Short Bulldog Guy | VA |

56. In Relator's third semester of training with DCCC and UHI, which took place from approximately **January 2016 - May 2016**, the composition and support status of the DCCC/UHI flight program was as follows:

| Module/Objective | Student | Support Status |
|---|---|---|
| COM | Relator | VA |
| COM | Shelby | VA |
| COM | Colton | VA |
| COM | Jesse F. | VA |
| | | |
| CFII | Chaylen | None - "Part 61," finished early |
| CFII | Nolan | VA |
| | | |
| IFR | Eric | VA |
| IFR | Lucas | VA |
| IFR | Tyler | VA |
| | | |
| PVT | Jesse W. | VA |
| PVT | Dylan | VA |
| PVT | Robert | VA |

57. In Relator's fourth semester of training with DCCC and UHI, which took place from approximately **May 2016 - August 2016**, the composition and support status of the DCCC/UHI flight program was as follows:

| Module/Objective | Student | Support Status |
|---|---|---|
| CFII | Relator | VA |
| CFII | Shelby | VA |

| | | |
|---|---|---|
| CFII | Colton | VA |
| | | |
| COM | Eric | VA |
| COM | Lucas | VA |
| COM | Tyler | VA - left early |
| | | |
| IFR | Jesse W. | VA |
| IFR | Dylan | VA |
| IFR | Robert | VA |
| | | |
| PVT | Penn. Guy | None |
| PVT | General's Son | None |

58. In Relator's fifth semester of training with DCCC and UHI, which took place from approximately **August 2016 - December 2016** (though terminated early), the composition and support status of the DCCC/UHI flight program was as follows:

| Module/Objective | Student | Support Status |
|---|---|---|
| CFI | Relator | VA |
| CFI | Shelby | VA |
| CFI | Colton | VA |
| CFI | Jesse F. | VA - left early |
| | | |
| CFII | Eric | VA |
| | | |
| COM | Jesse W. | VA |
| COM | Dylan | VA |
| COM | Robert | VA |
| | | |
| IFR | Penn. Guy | None |

59. As set forth in ¶¶ 54-58, DCCC/UHI were in blatant violation of the 85/15 Rule

throughout Relator's entire time there as a student.

60. In order to receive payment for Relator's tuition and fees, DCCC submitted documentation to the VA certifying that it was in compliance in all respects with the requirements of Title 38, U.S. Code (the authorizing statute for 38 CFR 21.4201–the 85/15 Rule.)

61. These were not small bills either. The average cost billed solely for Relator's flight instruction averaged nearly $60,000.00 per semester (please see Student Summary, attached as **Plaintiff's Exhibit A**).

62. Jiroux authorized UHI to submit, and UHI submitted, to DCCC invoices each term for tuition and flight fees for the flight training courses UHI provided in the Helicopter Program.

63. The UHI invoices were material to getting DCCC's claims paid because they substantiated actual costs of the flight training and that portion of tuition that went to DCCC.

64. Throughout Relator's time at DCCC, and almost certainly before as well, the helicopter program never was compliant with the 85/15 Rule and therefore each time DCCC submitted claims for VA benefits for Helicopter Program students, DCCC acted with (at least) reckless disregard for whether it was in fact compliant with 85/15.

65. Moreover, each time UHI submitted an invoice to DCCC for Helicopter Program tuition and fees, it did so with (at least) reckless disregard for the non-compliance of the Helicopter Program which it provided.

66. During Relator's time as a student in the Helicopter Program, DCCC made (at minimum,

as referenced in the charts above) forty-five such false certifications of compliance in the enrollment certifications/claims it submitted to VA.

67. As the administrators responsible over the entire Program, Gillum and Lyons had control over decisions regarding enrollment, acceptance into the Program, Program compliance, and reporting related to the Program. Gillum and Lyons were DCCC's final authorities on 85/15 compliance at DCCC. They advocated and prevailed upon other administrators to ignore the 85/15 Rule.

68. Upon receipt of claims with certifications of 85/15 compliance, VA paid DCCC funds for each VA-supported student.

69. UHI then invoiced DCCC for each Helicopter Program student's flight school fees and UHI's share of tuition and DCCC paid those invoices after it received payment from VA.

70. From amounts VA paid DCCC for the Helicopter Program, most of the money ultimately went to UHI.

### Regarding Flight Hour Overbilling / Failure to Reimburse

71. Each Module/Objective referenced in ¶¶54-58 corresponds with a certification awarded to a student upon achieving proficiency. As listed above, these include PVT (Private Pilot), IFR (Instrument), COM (Commercial), CFII (Certified Flight Instructor - Instrument) and CFI (Certified Flight Instructor). These are listed in the order in which Relator was trained (logically CFII should have followed CFI but something got mixed up there along the way.)

15

72. Relator's flight logs (attached as **Plaintiff's Exhibit B**) indicate flight hours billed subsequent to Relator having obtained his certification in the modules (save for CFI, since DCCC's Flight Program was suspended prior to Relator's completion of that module.) Additionally, these flight hours were billed in violation of the hourly limitations set forth in 8 CFR 21.4263(i).

73. Relator's flight logs also indicate ground hours billed subsequent to Relator having obtained his certification in the modules (save for CFI, since DCCC's Flight Program was suspended prior to Relator's completion of that module.)

74. To Relator's knowledge, none of the funds received for these hours improperly billed to the VA have been reimbursed by DCCC/UHI.

## COUNT I
### Violation of 31 U.S.C. §3729(a)(1)(A) - Submission of False Claims

75. DCCC, Lyons, Gillum, UHI and Jiroux violated the FCA by having knowingly presented, or having caused to be presented, false or fraudulent claims for payment. 31 U.S.C. §3729(a)(1)(A).

76. Defendants Jiroux and UHI knowingly caused DCCC to submit and DCCC submitted false or fraudulent claims for payment by failing to comply with the 85/15 Rule in UHI's portion of the Helicopter Program, and by invoicing DCCC for flight fees and tuition that would be paid by VA.

77. Defendants Lyons and Gillum knowingly caused DCCC to submit, and DCCC knowingly submitted false or fraudulent claims for payment to VA for veterans enrolled in DCCC's

16

Helicopter Program during terms when DCCC's own records show that the total enrollment of non-supported students in flight courses provided by UHI was less than 15%.

## COUNT II
### Violation of 31 U.S.C. §3729(a)(1)(B) - False Records or Statements

78. Defendants violated the FCA by having knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim. 31 U.S.C. §3729(a)(1)(B).

79. Defendants Lyons and Gillum knowingly caused DCCC to use and DCCC knowingly used false records or statements including false written certifications of compliance in claims submitted and in Compliance Calculations included in statements of assurance of compliance with the 85/15 Rule.

80. Defendants UHI and Jiroux knowingly caused DCCC to use false records or statements including false certifications of compliance with VA enrollment ratios and funding requirements in order to get its partner DCCC's false or fraudulent claims paid or approved by VA.

81. The uses of false statements were material as a matter of law, because they had a natural tendency to influence, or were capable of influencing, the payment or receipt of money in tuition and flight benefits to DCCC and UHI. Specifically, pursuant to regulations, VA only processes new enrollments of eligible veterans if the school provides a submission showing that the 85/15 percent ratio is satisfied. 38 CFR §21.4201(g)(1)(i).

82. While proof of damages is not an element of a claim under the FCA, Relator alleges that as a direct and proximate result of the false statements described herein, VA or the United States paid more money than it otherwise would have.

## COUNT III
### Violation of 31 U.S.C. §3729(a)(1)(G) - Reverse False Claim Violation

83. Defendants Jiroux, Lyons, Gillum, UHI and DCCC all know that DCCC and UHI have obtained overpayments from VA because of their violations of the FCA described above.

84. Defendants had and have a duty to self-report these overpayments and to return to the federal government any amounts that have been overpaid.

85. None of these Defendant has either reported the overpayments to any agency of the federal government or returned any money received or retained improperly.

86. Defendants have and continue to knowingly conceal or knowingly and improperly avoid obligations to pay money to the federal government in violation of 31 U.S.C. §3729(a)(1)(G).

87. Specifically, Defendants Gillum, Lyons and DCCC have knowingly avoided and continue to avoid repaying overpayments by improperly concealing the true facts of their ongoing failure to comply with the 85/15 Rule using false calculations and false certifications of compliance as alleged above.

88. Defendants Jiroux and UHI knowingly avoided, and continue to avoid repaying overpayments by improperly concealing the true facts of their ongoing failure to comply with the 85/15 Rule.

## COUNT IV
## Violation of 31 U.S.C. §3729(a)(1)(C) - FCA Conspiracy

89. Defendants violated 31 U.S.C. §3729(a)(1)(C) by conspiring to submit false or fraudulent claims and by conspiring to use non-qualifying students to count toward the required 15% non-supported enrollment requirement, and to use false statements and records to get false or fraudulent claims paid and by taking action in furtherance of these schemes to get false or fraudulent claims paid.

90. While proof of damages is not an element of a claim under the FCA, Relator alleges that as a result of the conspiratorial violations of the FCA, the United States has been injured in an amount to be proven at trial.

WHEREFORE Relator William Rowe, on behalf of himself and the United States, prays for judgment against all Defendants on all Counts jointly and severally for:

   a. Three times the amount of damages which the Government sustained as a result of the Defendants' violations of the FCA;

   b. For penalties for each FCA violation in the amount of $11,000.00 per violation;

   c. Relator be awarded between 20 percent and 30 percent of any proceeds resulting from this action or any resulting settlement, pursuant to 31 U.S.C. §3730(d);

   d. Defendants each be assessed jointly and severally an additional sum for all expenses of litigation incurred in this action, including reasonable attorney's fees;

   e. Any and all other relief as the Court may deem just and proper.

Respectfully Submitted,

GARCIA & ANTOSH, LLP
1401 Central
Dodge City, Kansas 67801
(620) 225-7400  P
(620) 225-4339  F
pja22@yahoo.com

By: _____
Peter J. Antosh     KS#21334
*Attorneys for Plaintiff-Relator*

20